a

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

CHRISTOPHER COPE,
Petitioner

CIVIL ACTION NO. 5:18-CV-1445-P

VERSUS

JUDGE ELIZABETH E. FOOTE

DARREL VANNOY,
Respondent

MAGISTRATE JUDGE PEREZ-MONTES

---

### REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 filed by *pro se* Petitioner Christopher Cope ("Cope") (#604759). Cope is an inmate in the custody of the Louisiana Department of Corrections, incarcerated at the Louisiana State Penitentiary ("LSP") in Angola, Louisiana. Cope challenges his first-degree murder conviction in the First Judicial District Court, Caddo Parish.

Because Cope's claims are procedurally defaulted or without merit, his Petition (Doc. 1) should be DENIED and DISMISSED WITH PREJUDICE.

## I.    Background

According to the Louisiana Second Circuit Court of Appeal:

While on duty in the early morning hours of October 24, 2010, Shreveport Police Sergeant Timothy Prunty made a routine stop at a west Shreveport convenience store to check on the employees who worked the night shift. While there, he spoke with his friend and shift clerk, Carey Sonnier. At approximately 3:24 a.m., Sergeant Prunty and Sonnier stood outside the store talking. Sonnier leaned on a grey pole located in front of Sergeant Prunty's vehicle, and Sergeant Prunty leaned on the hood of his car. Shortly thereafter, the two saw the approach of a red Camaro with very loud exhaust pipes. The driver pulled into the parking lot and stopped three spaces to the left (west) and slightly behind Sergeant Prunty's car.  Thinking she had a

customer, Sonnier moved to go back into the store.  As she did so, Sonnier heard several popping sounds, saw the flame from a gun and felt Sergeant Prunty shove her as he told her to run.  Sonnier ran behind a dumpster and hid behind a fence.  She saw the shooter spread his feet and hold the handgun with both hands for stability. Sonnier thought that the shooter was shooting at her as well as Sergeant Prunty.  An eyewitness who saw the events from an apartment across the street corroborated Sonnier's information about the car and the shooter.

Sergeant Prunty returned fire, shattering the glass T-top of the vehicle. The evidence showed that the driver fired 14 rounds from a .40 caliber Smith and Wesson gun and Sergeant Prunty fired 11 times from his Glock .22 police-issued pistol.

From behind the fence Sonnier saw the driver pull away slowly and calmly. She ran back to the front of the building and saw a police car driven by Corporal Naomi Johnson approaching. Johnson was in the area when she heard gunshots and dispatched a shots-fired call. She traveled in the direction of the shots and noticed Sonnier flagging her down.  Sonnier directed Johnson to Sergeant Prunty; she noticed blood around his leg area.  Johnson made the call for help at approximately 3:33 a.m.  From information given to her by Sonnier, Johnson was able to give a description of the driver and his vehicle as well as information that he was traveling west from the convenience store.

In the meantime, Shreveport Police Officer Lacey Durham who was trained as an emergency medical technician, overheard Johnson's call and traveled to the scene at approximately 3:37 a.m.  She recognized Sergeant Prunty and attempted treatment. The Shreveport Fire Department arrived at the store at approximately 3:39 a.m.  Lifesaving measures were attempted and Sergeant Prunty was transported to a local hospital where he later succumbed to his injuries.  The autopsy indicated that he received five gunshot wounds to both legs and feet; the leg wounds were inflicted from behind.  Sergeant Prunty's cause of death was loss of blood, which resulted largely from a laceration of the popliteal artery in his left upper leg; the bullet also fractured his distal femur and kneecap.  A second wound to his upper left leg shattered his left femur and caused blood loss.

After the description of the vehicle and driver was broadcast, several Shreveport police patrol officers began looking for a red Camaro driven

by a white, heavyset male with a goatee.[1] Shortly thereafter, several officers saw the vehicle and pursued the driver for eight to ten minutes before the vehicle stopped in a hotel parking lot. Glass particles fell from the Camaros' T-top throughout the chase.

Upon stopping the vehicle at 3:51 a.m., the driver opened his car door, held up a handgun, ejected its magazine and a live cartridge and dropped the weapon onto the pavement before standing up from the car. Upon being ordered to drop to the ground, the driver slowly complied and police eventually handcuffed him. When the driver would not yield his right arm, officers utilized distraction strikes to his hands, back, rib and shoulders. The suspect was advised of his rights and placed in a patrol vehicle. He informed a Shreveport Police Detective that his name was Christopher Cope. Because Cope was actively bleeding from abrasions above the eye and on his cheek, he was provided treatment from the Shreveport Fire Department.

Cope was transported to the Shreveport Police Department, Violent Crimes Bureau, at approximately 5:00 a.m. He was kept separate from other witnesses and made comfortable. His transport officers stayed with him in the room for approximately 30 minutes to an hour, and Cope made no statements to them other than asking how "he" was.

Cope was interviewed at 7:00 a.m., after being read his rights a second time. In a statement, Cope admitted to being the shooter, but suggested that he wanted the police officer to kill him. Cope indicated that he drank six or seven beers earlier in the evening but was not drunk. He had watched fights at a friend's house, hung out with a group of friends who had gathered on a local roadway, and visited a girlfriend. It was after he left the friend's house that he shot at the security guard house of a local subdivision across town with his Smith and Wesson .40 caliber gun. He then stopped at the convenience store intending to get a beer. He claimed that he did not make enough money to support himself, was still living at home, and was in a "funk." He stated that his mind "went blank" and he "done what [he] done." He had "no reasonable explanation" for it other than his "stupidity."

Sonnier was able to identify Cope as the shooter in a photographic lineup. On December 2, 2010, a grand jury indicted Cope for the first

---

[1] Notably the car matched the description of a vehicle from which a shot had been fired at a subdivision security guard about an hour earlier in another part of town.

degree murder of Sergeant Prunty.² Trial began on October 25, 2012. Cope was convicted as charged and sentenced to life imprisonment.

State v. Cope, 48,739 (La.App. 2 Cir. 4/9/14, 1–2); 137 So.3d 151, 155, writ denied, 2014-1008 (La. 12/8/14); 153 So.3d 440.

After the jury deadlocked on the sentencing portion of the proceedings, the court imposed a life sentence at hard labor without benefits.  See id.  Cope appealed his conviction, alleging three assignments of error: (1) denial of the motion to suppress the confession; (2) denial of the motion for change of venue; and (3) denial of right to present evidence that victim's wounds were survivable.   The conviction was affirmed on appeal, and the Louisiana Supreme Court denied Cope's request for review of the same claims.  Id.

Cope filed an application for post-conviction relief on October 12, 2015, alleging four claims for relief: (1) denial of the motion to suppress the confession; (2) denial of the motion for change of venue; (3) denial of the right to testify; and (4) ineffective assistance of trial counsel.  (Doc. 1-3, p. 43; Doc. 14-34, pp. 112-146).  The trial court found the denial of Cope's motions had been addressed on direct appeal, and that Cope failed to establish ineffective assistance.  (Doc. 14-34, pp. 155-156).  Writs were denied by the Louisiana Second Circuit Court of Appeal.  (Doc. 14-35, p. 57).  The Louisiana Supreme Court denied writs on August 4, 2017, finding that Cope's claims

---

² Cope was also charged with the attempted first-degree murder of Sonnier and the attempted first-degree murder of the security guard at the second crime location. The state severed these counts from the Sergeant Prunty first degree murder proceedings.

4

were repetitive, and that Cope could not show ineffective assistance of counsel. <u>State ex rel. Cope v. State</u>, 2016-0481 (La. 8/4/17), 222 So.3d 707.

Cope alleges that he did not receive a copy of the Louisiana Supreme Court's ruling. (Doc. 1-3, pp. 55-56). Therefore, on December 18, 2017, Cope wrote to the Louisiana Supreme Court to check the status of his case. The court inaccurately responded: "Your writ application is pending. The Court will notify you when it has reached a decision in this matter." (Doc. 1-3, p. 51). Cope waited for the ruling and sent another inquiry to the court on September 14, 2018. (Doc. 1-3, p. 52). This time, the court accurately reported that the writ application had been denied on August 14, 2017. (Doc. 1-3, p. 52). Cope filed his § 2254 petition in this Court, seeking equitable tolling.

## II.   <u>Law and Analysis</u>

### A.   <u>Cope's claims can be resolved under Rule 8(a) of the Rules Governing § 2254 Cases.</u>

The Court is able to resolve Cope's § 2254 Petition (Doc. 1) without the necessity of an evidentiary hearing because there are no genuine issues of material fact relevant to Cope's claims, and the state court records provide an adequate factual basis. <u>See</u> <u>Moya v. Estelle</u>, 696 F.2d 329, 332-33 (5th Cir. 1983); <u>Easter v. Estelle</u>, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

### B.   <u>The Court must conduct a deferential review under 28 U.S.C. § 2254.</u>

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall be considered only on the ground that

the applicant is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings or to substitute its own opinions for the determinations made by the trial judge. See Davis v. Ayala, 135 S. Ct. 2187, 2202 (2015) (citing Harrington v. Richter, 562 U.S. 86, 102–03 (2011)).

Under § 2254 and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See Martin v. Cain, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885 (2001). Therefore, § 2254(d) demands an initial inquiry into whether a prisoner's claim has been "adjudicated on the merits" in state court; if it has, AEDPA's highly deferential standards apply. See Davis, 135 S. Ct. at 2198 (citing Richter, 562 U.S. at 103).

When a federal claim has been presented to a state court and the state court has summarily denied relief without a statement of reasons, it may be presumed that the state court adjudicated the claim on the merits, in the absence of any indication

or state law procedural principles to the contrary.  <u>Richter</u>, 562 U.S. at 99.  A habeas court must determine what arguments or theories supported, or could have supported, the state court's decision, and whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  <u>See</u> <u>Richter</u>, 562 U.S. at 102.  Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden must be met by showing there was no reasonable basis for the state court to deny relief.  <u>Richter</u>, 562 U.S. at 98.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent.  A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts.  <u>See</u> <u>Martin</u>, 246 F.3d at 476; <u>see also</u> <u>Rivera v. Quarterman</u>, 505 F.3d 349, 356 (5th Cir. 2007), <u>cert. den.</u>, 555 U.S. 827 (2008).

A federal habeas court making the unreasonable application inquiry should determine whether the state court's application of clearly established federal law was objectively reasonable.  A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously.   Rather, a court must conclude that such application was also

7

unreasonable. See Martin, 246 F.3d at 476. An unreasonable application is different from an incorrect one. See Bell v. Cone, 535 U.S. 685, 694 (2002). When a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable. See Mitchell v. Esparza, 540 U.S. 12, 18 (2003); see also Davis, 135 S. Ct. at 2199 (citing Fry v. Pliler, 551 U.S. 112, 119 (2007)).

### C.    Cope cannot establish a violation with regard to his confession.

Cope alleges that the trial court erred in denying his motion to suppress his confession, which "was the product of fear, duress, intimidation, menaces, threats, inducements and/or promises." (Doc. 1, p. 30). Cope states that, after he was detained, he was advised of his Miranda rights at the scene by Officer Jason Allgrunn. (Doc. 1, p. 30). Cope maintains that Officer Allgrunn stated, "I wish you would have pointed that gun at us," and told other officers to "[g]ive this guy some love." (Doc. 1, p. 32). Cope was transported by an officer that admitted to striking Cope during his arrest. (Doc. 1, p. 30). Thus, Cope alleges that he was led to believe that he had to confess. (Doc. 1, p. 34). Cope argues that his confession was not voluntary and should have been suppressed. (Doc. 1, p. 34).

Cope's claim is without merit. A state court adjudication must be upheld unless it resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

See Martin, 246 F.3d at 475-76; 28 U.S.C. § 2254(d)(1).  The final reasoned state court opinion addressing this claim set forth the factual basis for its findings in great detail:

> At the hearing on the motion to suppress, the defense examined five of the Shreveport Police officers who secured Cope and placed him in custody.  Each of these officers also testified at trial.
>
> Officer Jason Allgrunn testified he was one of the six or seven officers who converged upon Cope when he exited his car.  Allgrunn read Cope his rights at a distance of approximately six inches from his left ear as he was lying face down.  Cope indicated he understood his rights by nodding.  Cope softly told Allgrunn that he was not resisting arrest.  Allgrunn did not smell alcohol on Cope's breath.
>
> Allgrunn stated that he never threatened Cope, did not promise anything to him or strike his person.  He saw no other officer strike Cope and did not hear anyone threaten him or promise him anything.  Allgrunn admitted that he made two statements, which can be heard on his mobile video system ("MVS").  Those included his comments that "I wish you would have pointed that at us," and "Give this guy some love."
>
> Sergeant Wiley Lindsey testified that once Cope was on the ground, numerous officers assisted in taking him down.  He indicated that "they were trying to place his hands behind his back, and he kept resisting, wouldn't put both of them behind his back."  Lindsey testified that "distraction strikes" were used in an attempt to get Cope's hands behind his back for handcuffing.  He stated the strikes were performed with fist blows upon Cope's arms, leg, thigh, and sides until he gave up his hands.
>
> Lindsey's MVS was played, and he narrated it.  He acknowledged hearing vulgarity on the tape at the time of Cope's arrest, but did not know who made the statements.  He stated that Cope did not respond in any way to the language.  He stated that after Cope's arrest, he was treated by the Shreveport Fire Department for abrasions on his face and arms.  Lindsey described the abrasions as being from the pavement because Cope was face down.
>
> Exhibit S–1 included the MVS evidence from both Sergeant Lindsey's and Officer Allgrunn's vehicles.  The exhibit also contained the MVS evidence from Corporals Tabor's and Hodges' vehicles, two officers who assisted in Cope's arrest but did not testify at the hearing.

Notably Sergeant Tabor's MVS was the only one to depict the details of Cope's arrest. It showed that upon the officers' verbal commands to Cope to lie on the ground, he slowly complied, lying face down on the pavement. Thereafter, 9 to 11 officers converged upon Cope. The video shows the securing officers having difficulty in handcuffing Cope's right hand. In an effort to secure the hand, Officer Hodges administered one or two strikes to his back, and one unnamed officer kicked him once near his upper body. Another officer administered several fist strikes near his shoulders. Within seconds thereafter, Cope's hand is secured, and he is handcuffed at approximately 3:32 a.m.

All officers then removed themselves from Cope. He was turned on his back and searched. He was placed face down again where he remained until 4:11 a.m., when he was placed in Officer Hodges' vehicle. In this interim period, officers are seen standing near Cope. Notably, one officer can been seen leaning over Cope and yelling at him. A second officer leaned down near Cope's ear for a few seconds as if he were whispering to him, although nothing can be heard on the video.

A photograph of Cope was taken at the police station after his arrest. It shows minor abrasions around Copes right eye and cheek.

Lieutenant Jimmy Muller testified that in his position as the Detective Bureau Executive Officer, he assigned tasks for the detectives servicing the case. He instructed Officers Hodges and Minor, who transported Cope to the station, to maintain Cope as a suspect separate from any other witnesses. Cope was taken to the property crimes unit and placed in an empty office. Hodges sat with Cope in the room with Minor outside the door. Muller asked Cope if he wanted him to call his father. Cope declined the offer but stated that he was thirsty. He was provided water and allowed to take his handcuffs off while waiting to be interviewed. Restroom facilities were provided for Cope. Muller did not ask Cope anything or threaten or promise anything to him. Cope appeared lucid to Muller. He stated that Cope did not appear to be intoxicated or under the influence of anything.

Sergeant Jody Jones testified that he was in charge of the day shift homicide unit and was on call the weekend of this event. Jones and Detective Lane Smith interviewed Cope, having waited until other witnesses had first been interviewed.

Cope was interviewed at 7:00 a.m. No pre-interview was conducted. In fact, Jones had no contact with Cope prior to the formal interview. An audio recording of the interview was placed in evidence. Jones testified that videotape recorders were never used in his division.

Jones testified that Cope was read his rights a second time prior to giving a statement. Cope was not upset or emotional. Jones identified a copy of the waiver form signed by Cope. Jones recalled that Cope understood what was being shown to him. He did not appear to be intoxicated, was offered no inducement to sign the document, was not promised any benefit for giving a statement, and was not threatened in any way. Cope was not tested for intoxication. Cope signed the form and verbally acknowledged that he was willing to waive his rights.

Detective Lane Smith had actually spoken to Cope before he was taken to the station and had assigned Officer Hodges and Minor to protect Cope from any hostility of other officers. He confirmed Jones's testimony concerning Cope's condition during his statement.

Officer Chris Hodges, who testified at trial, was also present as Cope exited his car and was arrested. He issued commands to Cope to get out of the car. Cope complied. Hodges proceeded to Cope and attempted to handcuff him. He described Cope as "tense." It was Hodges who "delivered a couple of strikes to his back to gain compliance" and was then able to get him handcuffed. Hodges recalled that it was Cope's right arm that was not yielding, "up towards the front of his chest area." He was concerned that Cope had a weapon. When questioned about the video of Cope's arrest, Hodges admitted that other officers delivered strikes to get Cope into handcuffs.

Hodges explained that a distraction blow is a closed fist strike used to gain compliance, which can be done to the back or ribs in an effort to pull the arm out. Hodges did use his fists and inflicted the blows "in the shoulder area of [Cope's] back." After Cope was handcuffed, Hodges rolled him over to his back and conducted a pat-down search for weapons. Hodges did not recall that Cope said anything.

Hodges also testified that at the station he never questioned Cope during the time that he guarded him. Cope never asked for food or for a lawyer or to speak to relatives or to friends. Hodges described Cope as being without emotion. He recalled that Cope asked how "he" was,

11

referring to Sergeant Prunty. Hodges told Cope that he did not know, although he knew the officer was deceased.

Officer Jimmie Minor was called at trial by the defense. Minor first became involved with Cope as he was taken into custody. He stayed with Cope on the scene and then followed Officer Hodges to the Shreveport Police Department. The room where Cope was guarded was fairly deserted and no other officers came into contact with him. Minor was instructed to stay with Cope until detectives arrived to interview him. He recalled that his time with Cope spanned nearly two hours. Minor was instructed to keep Cope comfortable. He testified that he was not abusive toward Cope, who was quiet and stared at the ground most of the time. Minor recalled that Cope asked him "several times" how the Sergeant was doing.

As a DWI enforcement officer, Minor saw nothing in Cope to cause him to request a breath test. Minor stated that Cope was able to walk to the bathroom on his own, did not request to speak to a lawyer or to his father or any family members or friends. He never used physical force against Cope or threaten him in any way. He and Officer Hodges never promised him anything. Minor recalled that Cope's eyes were red and moist. Minor saw Cope cry on one occasion during his custody, but he never said he was sorry for what he did.

The record before us does not demonstrate error in the trial court's determination that Cope's statement was free and voluntary. Eight officers testified about the circumstances leading to Cope's statement. His recorded statement reveals a coherent, cooperative defendant who responded appropriately to the interrogation. He answered all questions appropriately despite his claims of being "particularly vulnerable" as a 24–year–old dropout. His awareness of his situation is shown by his inquiries about the condition of Sergeant Prunty. It is undisputed that Cope was informed of his rights on two occasions, once immediately prior to his statement. His waiver of those rights was likewise clear, calm and logical. Significantly, Cope was afforded physical comfort in the two hours in which he waited to be interviewed. After the initial scuffle with the officers, his contact with police officers was limited to the two who guarded him and the two who interviewed him.

The record does not support Cope's claim that the "threats" and "abuse" he received at the arrest scene and during transport defeated the state's burden of proof. Although the video evidence of Cope's arrest shows that

12

officers struck Cope several times, it also corroborates the officers' testimony that the strikes were used during their struggle to obtain Cope's right hand.  The distraction strikes, including the inappropriate kick by one officer, occurred for only seconds, were not excessive and accomplished their purpose quickly.  The only noticeable physical injuries Cope received as the result of his arrest were minor abrasions to his face, for which he received immediate treatment.

Likewise, Hodges' actions during arrest were legitimate methods of subduing Cope, and the video evidence of Cope's transport reveals no evidence of actual or perceived coercion by Hodges.  In fact, that evidence shows that neither Cope nor Hodges made any statements during travel. Ultimately, Hodges never interviewed Cope and answered only one question.

The statements made by officers at the arrest scene, while emotionally charged, were not shown to have been intended to obtain a confession. The video shows that Cope had limited close-up exposure to police at the arrest scene and the statements made to him were one-time events of short duration.

From this evidence it was not unreasonable for the trial court to conclude that statements made by the officers reflected their anger at Cope for shooting a fellow officer rather than coercive efforts to obtain a statement of guilt and that the force used by the officers was designed to subdue Cope and not to compel a confession. Ultimately, with Cope's confession being given some two hours after any of these events, we find no error in the trial court's determination that statements made to Cope at his arrest did not render his statement involuntary. For these reasons, this assignment of error has no merit.

Cope, 137 So.3d at 158-162.

As the State argues, Cope's conclusory allegations are "contradicted by the audio, visual, and testimonial evidence presented to the trial court at both the hearing on the Motion to Suppress and the trial" and "are insufficient to present the clear error required to override the presumption of correctness afforded to the state court's factual findings." (Doc. 14-1, p. 23).  Moreover, Cope has not demonstrated

13

that the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 22 U.S.C. § 2254(d)(1). There is no indication that Cope's statements were made without compliance with the requirements of <u>Miranda</u>.

Lieutenant Muller testified that when Cope arrived at the police station, two officers were assigned to him for his security and that he was offered water and the use of bathroom facilities. In fact, Lieutenant Muller realized that Cope's father was a retired police captain and offered to call his father to come to the station. Cope declined the offer. (Doc. 14-11, p. 90).

Sgt. Jones testified that Cope was kept in a separate part of the police station where no officers would interact with him in an effort to ensure his safety and to preserve the investigation. (Doc. 14-11, pp. 107-08).

Detective Smith testified that he gave special instructions to protect Cope and ensure the integrity of Cope's interrogation. (Doc. 14-11, p. 131). Detective Smith "made sure the officers did not give the time that they left the scene or arrival at the office over the radio" "to ensure that no one that might be upset about a brother officer being a victim could do something rash." (Doc. 14-11, p. 131).

Cope was arrested around 3:45 a.m., and his interview began around 7 a.m. More than three hours passed between the chase and the time at which Cope confessed. (Doc. 14-11, p. 132).

According to the record, Cope was protected from harm and intimidation while in police custody; he was offered the opportunity to have his father—a department veteran—meet him at the station; and Cope freely made his statement. Thus, Cope's claim is without merit.

### D.    Cope cannot establish a constitutional error regarding venue.

Cope alleges that he was denied due process when the trial court denied his motion to change venue. According to the record, Cope did not present the federal nature of his claim to the Louisiana Second Circuit Court of Appeals on direct review. He relied solely on state law. (Doc. 14-33, pp. 289-91). On collateral review, Cope presented a federal basis for the venue claim. (Doc. 14-34, p. 136). However, the trial court found the claim duplicative. (Doc. 14-34, p. 155). The Second Circuit denied writs "[o]n the showing made" (Doc. 14-35, p. 57), and the Louisiana Supreme Court denied writs as repetitive. (Doc. 14-35, p. 117).

Procedural default exists where: (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal ("traditional" procedural default); or (2) the petitioner fails to properly exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred ("technical" procedural default). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. Bledsue v. Johnson,

188 F.3d 250, 254–55 (5th Cir. 1999) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n. 1 (1986) and <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838 (1999)).

Cope's venue claim is subject to a "traditional" procedural default. "When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." <u>Hughes v. Johnson</u>, 191 F.3d 607, 614 (5th Cir. 1999). Cope has not provided evidence of cause or prejudice, or a fundamental miscarriage of justice.

Due process for criminal defendants includes the right to a fair trial by a panel of impartial jurors whose verdict must be based upon the evidence developed at trial without regard for "the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961). "It is not required, however that the jurors be totally ignorant of the facts and issues involved." <u>Id.</u> "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." <u>Id.</u>

The state court adjudication must be upheld unless it resulted in a decision that was contrary to, or involved an unreasonable application of this clearly established federal law. <u>See</u> <u>Martin v. Cain</u>, 246 F.3d 471, 475-76 (5th Cir. 2001), <u>cert.</u> <u>den.</u>, 534 U.S. 885 (2001); 28 U.S.C. § 2254(d)(1). Once again, the final reasoned

state court opinion addressing the venue claim set forth the basis for its findings in great detail:

> Cope next argues that the trial court erred in denying his motion for change of venue based upon the nature and extent of pretrial publicity. He asserts that such publicity affected the jury venire to the extent that Cope could not obtain a fair and impartial jury.
>
> In pretrial proceedings, the State stipulated to its release to the media of video from one of the police vehicles documenting Cope's arrest. Subsequently, Cope filed a Motion for Change of Venue arguing that the nature and extent of pretrial publicity, which was "encouraged by the direct involvement of the District Attorney's Office," was so pervasive as to deprive him of a fair and impartial jury. With the agreement of the defense, the Court deferred ruling on the motion until voir dire of potential jurors. After a jury of 12 was selected and during voir dire for alternates, after each had been examined and challenged on publicity, the defense re-urged its venue challenge.
>
> The defense argued that Cope could not have a fair trial due to the percentage of jurors who indicated exposure to the case and the inflammatory publicity, including the details of the arrest and broadcast of Cope's photograph. The court denied the defense's motion pointing out that it had "painstakingly, individually questioned each and every prospective juror on this issue."
>
> La. C. Cr. P. art. 622 states: A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
>
> The right to an impartial jury and a fair trial is guaranteed to every defendant. See La. Const. art. I, §16; State v. Magee, 11–0574 (La. 9/28/12), 103 So.3d 285, cert. denied, —— U.S. ——, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013); State v. Sparks, 88–0017 (La. 5/11/11), 68 So.3d 435, cert. denied, —— U.S. ——, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012). To effect this guarantee, the law provides for a change of venue when a

17

defendant establishes that he or she will be unable to obtain an impartial jury or a fair trial at the place of original venue. Id.

It is only in exceptional circumstances, such as the presence of a trial atmosphere that is utterly corrupted by press coverage or that is entirely lacking in solemnity and sobriety, that prejudice against a defendant may be presumed. Magee, supra. Otherwise, it is the defendant's burden to demonstrate actual prejudice. Id.

To meet this burden, a defendant must prove more than mere public general knowledge or familiarity with the facts of the case. He must demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case. Magee, supra; State v. Clark, 02–1463 (La.6/27/03), 851 So.2d 1055, cert. denied, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004); State v. Frank, 99–0553 (La. 1/17/01), 803 So.2d 1. A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime; rather, he must show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. Magee, supra; Clark, supra. Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the district court's sound discretion, which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion. Magee, supra; Sparks, supra.

In State v. Bell, 315 So.2d 307 (La. 1975), the Louisiana Supreme Court enumerated several factors to be considered in the change of venue determination. These factors include: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community, which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.

In determining whether to change venue, the focus must extend beyond the prejudices and attitudes of individual venire persons. The defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, prejudice or influences exist within the community at large that would affect the

18

jurors' answers during voir dire or the witnesses' testimony, or that for any other reason, a fair and impartial trial could not be obtained in that venue.  Magee, supra; Clark, supra; Bell, supra.  The district court's ultimate determination must rest on the community's attitude toward the defendant.  Magee, supra; Clark, supra.

In reviewing a denial of change in venue, the primary task of the court is to inquire as to the nature and scope of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial in order to ascertain whether prejudice existed in the minds of the public, which prevented the defendant from receiving a fair trial.  Magee, supra; Clark, supra.

In performing this review, courts must distinguish largely factual publicity from that which is invidious or inflammatory, as the two present real differences in the potential for prejudice.  Id.  While ultimately there is no bright line test for ascertaining the degree of prejudice existing in the collective mind of the community, the seven Bell factors help facilitate the inquiry.  Magee, supra.  In addition, courts have examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind.  Id.

Before consideration of the responses of potential jurors in the actual voir dire examination in this case, Cope argues that the Caddo Parish jury pool was tainted by news reports showing an MVS video of his arrest and his arrest photograph that were given to a local television station by the District Attorney's office.  He contends that the death of Prunty was "well known" in the community and "left little doubt" in the minds of the public about Cope's guilt.

Nevertheless, Cope made no showing regarding when or if the MVS video was run on the news by a station.  No tapes of local newscasts were placed in evidence. No print or electronic media accounts were offered. In sum, no substantial body of pretrial publicity was shown to the court, particularly, no direct evidence of the prejudicial or inflammatory nature of the media information.

This lack of excessive and inflammatory publicity contrasts to other cases in the jurisprudence examining the issue of venue change. See, for example, Magee, supra, which included extensive evidence of media

19

coverage, including 200 pages of newspaper articles, online comments from the public, transcripts of television coverage of the crime and multiple DVDs containing recordings from major local media outlets; State v. Lee, 05–2098 (La. 1/16/08), 976 So.2d 109, cert. denied, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008), in which the defense introduced "thousands of print and media stories" about the case; Manning, supra, where 14 newspaper articles were submitted concerning the crime; and Clark, supra, in which numerous newspaper articles relating to the case and a number of transcripts from a local television station were introduced.

Further, we have reviewed the information obtained by the actual examination of prospective jurors. The trial court interviewed 190 potential jurors.  Of those 190, 156 (82%) indicated that they had some exposure (most with vague factual recollections of the events) to the case; 34(18%) individuals knew nothing about the case. The court individually interviewed the 156 potential jurors.

Of the 156 jurors with knowledge of the death of the officer, 36 (19%) were removed for preconceived opinions of the defendant's guilt. The defense challenged two additional jurors for such pretrial opinions of guilt, which were denied by the court.  An additional 18 potential jurors were challenged for cause due to impartiality because of relationships to or with law enforcement (8), Prunty (5) or Cope (5). Ultimately, of the 15 jurors and alternates chosen, 7 (47%) had no knowledge of the case. The remaining 8 jurors who served on the case with some knowledge of the murder assured the court that they would be able to decide the case solely on the evidence; one of those was an alternate juror.

Importantly, of the 82% of potential jurors who knew about the case, only a few expressed more than a vague knowledge about the facts, which they had gleaned from the news or from conversations. None mentioned seeing a video on the news. Only two recalled seeing Cope's photograph. These facts fail to demonstrate any deep-seated pattern of prejudice against the defendant.  Rather, all that was shown is a general level of public awareness about the crime. When compared with other cases in which the Supreme Court has found no abuse of discretion in the denial of a venue change, this percentage falls within the range of acceptable general public awareness.  See for example, Magee, supra, in which 43% of prospective jurors noted their familiarity with the facts of a case; Lee, supra, in which 98.4% were vaguely familiar with the case through media or conversations; Clark, supra, in which 62.9% claimed

some exposure to the case; <u>Frank</u>, <u>supra</u>, where 97% of the venire had been exposed to some publicity; <u>State v. Hoffman</u>, 98–3118 (La. 4/11/00), 768 So.2d 542, <u>cert.</u> <u>denied</u>, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000), in which 80% of the prospective jurors had awareness of the case before trial; <u>State v. Connolly</u>, 96–1680 (La.7/1/97), 700 So.2d 810, in which 86.33% of potential jurors possessed a vague recollection of the facts.

Likewise, the 19% of jurors with fixed opinions is inadequate to demonstrate reversible prejudice in the public mind. All of the prospective jurors who expressed a pretrial opinion of Cope's guilt based upon pretrial information of the crime were released for cause. Moreover, such percentage also falls within ranges sanctioned by the courts as acceptable. <u>See</u> <u>Murphy v. Florida</u>, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), in which 26% with pretrial guilt opinions held not to show prejudice; <u>Sparks</u>, <u>supra</u>, where 12.5% fixed opinion was insufficient to demonstrate prejudice; <u>Lee</u>, <u>supra</u>, in which 32% of potential jurors excused for exposure to case or fixed opinions found insufficient to show public prejudice; <u>Frank</u>, <u>supra</u>, in which 15% of jurors excused due to an inability to put aside preconceived disposition or outside information found insufficient to show prejudice. Compare <u>Irvin v. Dowd</u>, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), in which 62% excused for fixed opinion indicated that impartial jurors were hard to find.

After applying the first <u>Bell</u> factor to these facts, we cannot say that the defense has shown that the events in question fostered such emotionally charged media coverage as to prejudice Cope's right to a fair trial. Additionally, we do not find persuasive Cope's arguments regarding the second <u>Bell</u> factor, the connection of government officials with publicity. A review of the jurisprudence shows that this factor relates to statements made by government officials connected to the case which are harmful or inflammatory and incite prejudice in the minds of the public.

In this case, the District Attorney's office stipulated that it had released the subject video to a local television station. However, on the hearing for change of venue, the defense presented no evidence that any government official involved in the matter, including any individual from the District Attorney's office, made any comments or offered any opinion about the case to the media. Thus, Cope's argument that the actions of the District Attorney's office created communitywide

21

prejudice against him such that he could not receive a fair trial is not supported by the evidence. Compare <u>Magee</u>, <u>supra</u>, where comments by both the district attorney and sheriff regarding the gruesomeness of the crime were reviewed.

The remaining five <u>Bell</u> factors also afford Cope no relief and are not seriously raised in argument. The trial in this matter occurred about two years after the crime. While the murder of a police officer would necessarily receive media attention, the defense has not shown that the case received more notoriety than any other capital murder case. Cope has also failed to demonstrate that the area from which the jury was drawn showed overriding prejudice in the community that prevented him from receiving a fair trial. According to the 2010 Census, Caddo Parish has a population of 254,969 people. From this large number of individuals, a qualified and fair jury was possible.

Given the broad discretion granted to trial courts in these matters, we cannot say that Cope has established an abuse of discretion in the denial of his request for change of venue. Overall, he has failed to demonstrate that prejudice against him existed in the collective mind of the community such that a fair trial was not possible. For these reasons, this assignment of error lacks merit.

<u>Cope</u>, 137 So.3d at 162–65.

The Second Circuit's thorough consideration of the claim follows Supreme Court jurisprudence. The Second Circuit recognized the trial judge's careful management of the voir dire process, including individual voir dire about exposure to pre-trial publicity; the numbers of jurors who had some knowledge of the case compared to those who did not; the depth of the knowledge those jurors had about the case; and the lack of evidence about the extent of media publicity. The record reveals that 10 days of jury selection process passed before the motion was urged. In denying Cope's motion to change venue, the trial court stated:

In fact . . . I know that there has not been a single juror seated in this case that if the defense counsel had requested a challenge for cause with regard to pretrial publicity the Court would have granted it, and none was done.

To the contrary, defense counsel, and I noted this midweek, defense counsel was rehabilitating several of the prospective jurors who said that they had formed an opinion of guilt. For the record, I note most of those were African American females . . . .

But this is the 10th day of jury selection. The Court has painstakingly, individually questioned each and every prospective juror on this issue. There has not been a single objection by defense counsel to any of the jurors who have been selected. So the—actually the, I believe that defense counsel has waived their right to object at this time. The time to object was over the past 10 days when these jurors were being questioned . . . .

. . . This Court did conduct individual voir dire of each and every prospective juror who was questioned in this case. The Court painstakingly, individually conducted voir dire on each of those prospective jurors.

Defense counsel did not object to any of the 12 jurors who have been selected in this case with regard to pretrial publicity and did not ask for a challenge for cause on any of them . . . . Had they been objecting along to the pretrial publicity of any of the jurors, that might have been a different, I might be of a different opinion.

(Doc. 14-24, pp. 8-9, 13-14).

The cases Cope now relies on, <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963), <u>Estes v. Texas</u>, 381 U.S. 532 (1965), and <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966), are plainly distinguishable from Cope's case. In <u>Rideau</u>, the defendant's 20-minute taped interview by a sheriff, in which he confessed in detail to bank robbery, kidnapping, and murder, was repeatedly broadcast to a rural community. <u>Rideau</u>, 373 U.S. at 723–724. Accordingly, the United States Supreme Court found that the exposure was

so widespread that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." Id.   In Estes, there was "considerable disruption" caused by the media during trial, and in Sheppard, there was a "carnival atmosphere." Estes, 381 U.S. at 536; Sheppard, 384 U.S. at 333.  There is no evidence of such inflammatory publicity in Cope's case, and Cope cannot establish either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice.

E.    Cope fails to establish that he was denied his right to present evidence.

Cope alleges that he was denied his right to rebut the State's claim that Sergeant Prunty's wounds were not survivable.  Cope cites Crawford v. Washington, 541 U.S. 36 (2004) in support of his claim.

During Cope's trial, the court ruled that Cope would not be allowed to present evidence of survivability through its expert.  Cope sought writs in the Second Circuit relying on state law.  (Doc. 14-10, pp. 126-134).  In his petition to the Louisiana Supreme Court, Cope cited Crawford.  Cope did not raise the claim in further post-conviction review.  The State argues that Cope's claim is not exhausted because Cope did not alert the Second Circuit to the federal nature of his claim.  Cope is now procedurally barred from re-raising the federal claim in the state courts.

Under Louisiana Code of Criminal Procedure article 930.8, no application for post-conviction relief shall be considered if it is filed more than two years after the

judgment of conviction and sentence has become final, unless any of the following apply:

(1)    The application alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his prior attorneys. Further, the petitioner shall prove that he exercised diligence in attempting to discover any post-conviction claims that may exist. "Diligence" for the purposes of this Article is a subjective inquiry that must take into account the circumstances of the petitioner. Those circumstances shall include but are not limited to the educational background of the petitioner, the petitioner's access to formally trained inmate counsel, the financial resources of the petitioner, the age of the petitioner, the mental abilities of the petitioner, or whether the interests of justice will be served by the consideration of new evidence. New facts discovered pursuant to this exception shall be submitted to the court within two years of discovery.

(2)    The claim asserted in the petition is based upon a final ruling of an appellate court establishing a theretofore unknown interpretation of constitutional law and petitioner establishes that this interpretation is retroactively applicable to his case, and the petition is filed within one year of the finality of such ruling.

(3)    The application would already be barred by the provisions of this Article, but the application is filed on or before October 1, 2001, and the date on which the application was filed is within three years after the judgment of conviction and sentence has become final.

(4)    The person asserting the claim has been sentenced to death.

La. C. Cr. P. art. 930.8. Cope does not meet any of the exceptions provided by article 930.8 regarding the survivability claim.

Because Cope would now be time-barred from raising the federal claim in state court, his claim is subject to a "technical" procedural default. See Bledsue, 188 F.3d 250, 254–5 (5th Cir. 1999) (citing Coleman, 501 U.S. 722, 731–33 (1986)).    Cope

25

cannot show "cause" for the default and "prejudice" attributable thereto, or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." <u>Finley v. Johnson</u>, 243 F.3d 215, 220 (5th Cir. 2001) (citing <u>Murray v. Carrier</u>, 477 U.S. 478, 485, 495 (1986)). Cope has not alleged any cause for his failure to raise the federal nature of his claim in state court.

Moreover, Cope's claim is factually inaccurate. Although the trial court initially ruled against Cope, the Second Circuit reversed the ruling, and Cope was actually allowed to present his defense of survivability. (Doc. 14-10, p. 148; Doc. 14-31, pp. 121-24).

Specifically, the trial court allowed Cope to present evidence regarding the survivability of the wounds through the testimony of his expert, Dr. Lauridson. (Doc. 14-31, pp. 84-102). For example, Dr. Lauridson stated that Sergeant Prunty's popliteal injury would have caused the most blood loss. (Doc. 14-31, p. 98). He explained that the simplest and most effective treatment for this condition is pressure or compression applied to the wound to close the vessel. (Doc. 14-31, p. 98). Dr. Lauridson believed that if pressure had been applied between five and eight minutes after the injury, Sergeant Prunty would not have developed severe hemorrhagic shock that led to his death. (Doc. 14-31, p. 99). He stated that compression applied within this timeframe "would have greatly increased" the officer's survivability. (Doc. 14-31, p. 99). Dr. Lauridson admitted that pooling of blood in the groin area might have led medical personnel to think that the upper thigh wound, rather than the wound to

the knee, was the wound that had lacerated an artery and caused the blood loss. (Doc. 14-31, p. 108). Therefore, Cope's claim is unsupported by the record.

### F.    <u>Cope was not denied the right to testify.</u>

Cope claims that his constitutional rights were violated when he was denied the right to testify at trial. Cope alleges that he "insisted to his counsel numerous times that he wanted to testify." (Doc. 1, p. 46). Cope raised the claim in his post-conviction proceedings, but it was denied because he did not raise the claim in his pre-trial proceedings or on appeal. (Doc. 14-34, pp. 155-56). The trial court relied on article 930.4 of the Louisiana Code of Criminal Procedure. (Doc. 14-34, pp. 155-56). Because the state court relied on an independent and adequate state procedural rule, federal habeas review is barred unless Cope can demonstrate either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice. <u>Hughes</u>, 191 F.3d at 614. Cope does not demonstrate cause or prejudice or a fundamental miscarriage of justice.

A defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense. <u>Rock v. Arkansas</u>, 483 U.S. 44, 49 (1987). However, a petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand. <u>See</u> <u>Turcios v. Dretke</u>, 2005 WL 3263918, *6 (S.D. Tex. 2005) (citing <u>Underwood v. Clark</u>, 939 F.2d 473, 475–76 (7th Cir. 1991).

At no time during the trial did Cope object or complain about his right to testify. In fact, at the conclusion of both the trial and sentencing, Cope was advised by the trial judge of his right to testify. Cope confirmed that he understood the right, and it was his decision not to testify. (Doc. 14-31, pp. 166-67; Doc. 14-33, pp. 103-4).

There is nothing in the trial record to suggest that Cope's alleged desire to testify was rebuffed by his counsel or the trial court. Cope's conclusory allegation is contradicted by the transcript and insufficient to support his claim.

### G.   Cope cannot establish ineffective assistance of counsel.

Cope alleges that counsel was ineffective by denying his request to testify in his own defense at trial and conceding his guilt to the jury. In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced his defense. See id. at 697.

To prevail on the deficiency prong, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F .3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must consider the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge . . . counsel's challenged

28

conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel's actions, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In deciding whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.  If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.  Strickland, 466 U.S. at 697.

A claim of ineffective assistance of counsel is a mixed question of law and fact. Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Therefore, this Court must defer to the state court on such claims unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

29

Cope has not shown that his counsel rendered ineffective assistance by refusing to allow him to testify.  The record establishes conclusively that Cope was advised on two occasions by the court of his right to testify and that the decision was his, and both times Cope stated decisively that he did not wish to do so.  (Doc. 14-31, pp. 166-67; Doc. 14-33, pp. 103-4).  Thus, Petitioner has failed to carry his burden of showing that the state court's ruling denying this claim is in contravention to or an unreasonable application of <u>Strickland</u>.

Next, Cope argues that an alleged confession of guilt by his trial counsel violated his constitutional rights under <u>United States v. Cronic</u>, 466 U.S. 648 (1984) and <u>McCoy v. Louisiana</u>, 138 S. Ct. 1500 (2018).  Cope did not raise the <u>McCoy</u> claim in the lower courts.

<u>Cronic</u> held that, if counsel entirely fails to subject the prosecution's case to a meaningful adversarial testing, then there has been a denial of Sixth Amendment rights and the adversary process is presumptively unreliable.  <u>Cronic</u>, 466 U.S. at 659.  <u>Cronic</u> is reserved only for those extreme cases in which counsel fails to present any defense.  <u>Haynes v. Cain</u>, 298 F.3d 375, 381 (5th Cir. 2002).

Cope's attorneys filed numerous motions to suppress statements and evidence, and a hearing was conducted on the motions.  (Doc. 14-11, pp. 6-173).  At the hearing, Cope's attorneys examined five of the police officers who secured Cope and placed him in custody.  (Doc. 14-11, pp. 6-173).  Cope's attorneys also pursued a motion for change of venue.  (Doc. 14-8, pp. 146-149).  Cope's attorneys spent weeks selecting a jury and

30

trying the case. There is no evidence indicating that Cope's attorneys failed to provide zealous and effective representation. Therefore, Cope cannot establish that the state court's ruling is in contravention to or an unreasonable application of <u>Cronic</u>.

Finally, Cope alleges that his counsel's strategy of conceding guilt in spite of Cope's objection entitles him to a new trial under <u>McCoy</u>. First, the <u>McCoy</u> claim was not raised in post-conviction litigation as <u>McCoy</u> had not yet been decided. Cope had the right under La. C. Cr. P. art. 930.8A(2) to file a second application for post-conviction relief in the trial court for purposes of making a <u>McCoy</u> claim. However, there is no evidence that Cope filed a second application raising the <u>McCoy</u> issue, and Cope does not allege that he exhausted the claim.

Under article 930.8(A)(2) of the Louisiana Code of Criminal Procedure, Cope had one year from the Supreme Court's ruling in <u>McCoy</u> to bring his claim in the state courts. That time expired on May 14, 2019. Therefore, if Cope was to now attempt to raise the claim in the state courts, it would be time-barred.

Because Cope did not exhaust state court remedies and the time within which to do so has lapsed, the <u>McCoy</u> claim is "technically" procedurally defaulted. <u>See</u> <u>Bledsue</u>, 188 F.3d at 254–5 (citing <u>Coleman</u>, 501 U.S. at 731–33). In order to obtain review of the <u>McCoy</u> claim, Cope has to show "cause" for the default and "prejudice" attributable thereto, or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." <u>Finley</u>, 243 F.3d at 220 (citing <u>Carrier</u>, 477 U.S. at 485, 495).

Cope has not alleged any cause for his failure to file a post-conviction application raising the McCoy claim. In fact, Cope fails to address the issue of exhaustion entirely in his reply to the State's response to the petition. (Doc. 15).

Likewise, Cope cannot meet the fundamental miscarriage of justice exception, which is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him. See Coleman, 501 U.S. at 750; Ward v. Cain, 53 F.3d 106, 108 (5th Cir. 1995). Essentially, Cope would have to show that, as a factual matter, he did not commit the crime for which he was convicted. Fairman v. Anderson, 188 F.3d 635, 644 (5th Cir. 1999). Cope has not alleged that he is actually innocent, and he has presented no factual support for such a claim.

Regardless, Cope's case is distinguishable from McCoy. At the beginning of the opening statement in McCoy's trial, his attorney told the jury there was "no way reasonably possible" that they could hear the prosecution's evidence and reach "any other conclusion than Robert McCoy was the cause of these individuals' death." McCoy, 138 S.Ct. at 1506. McCoy protested; out of earshot of the jury, McCoy told the court that his attorney was "selling [him] out" by maintaining that McCoy "murdered [his] family." Id. The trial court reiterated that counsel was "representing" McCoy and told McCoy that the court would not permit "any other outbursts." Id. at 1507. Continuing his opening statement, counsel told the jury the evidence is "unambiguous" [that] "my client committed three murders." Id. at 1507.

"McCoy testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom."  Id.

In his closing argument, counsel reiterated that McCoy was the killer and that he "took [the] burden off of [the prosecutor]." Id.  The jury then returned a unanimous verdict of guilty of first-degree murder on all three counts.  At the penalty phase, counsel again conceded "Robert McCoy committed these crimes," but urged mercy in view of McCoy's "serious mental and emotional issues." Id.  The jury returned three death verdicts.  Id.

The Supreme Court observed that McCoy "opposed [counsel's] assertion of his guilt at every opportunity, before and after trial, both in conference with his lawyer and in open court." McCoy, 138 S.Ct. at 1509.  McCoy's objection was clearly stated and persistent.  But here, there is no indication in the record that Cope ever objected to his attorney's strategy.  In fact, Cope does not state when he supposedly objected to the strategy.  At no point during opening statement, closing argument, or during recesses, did Cope voice any objection to his attorneys' arguments or theories.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;" that is, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland 466 U.S. at 689 (citing Michel v. State of La., 350 U.S. 91, 101 (1955)).

33

## III.  <u>Conclusion</u>

Because Cope's claims are procedurally defaulted or without merit, IT IS RECOMMENDED that his Petition (Doc. 1) be DENIED and DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), any party may serve and file with the Clerk of Court written objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections or reply briefs) may be filed, unless a party shows good cause and obtains leave of court.  The District Judge will consider timely objections before issuing a final ruling.

A party's failure to file written objections to the proposed factual findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days after being served with a copy thereof, or within any extension of time granted by the Court under Fed.R.Civ.P. 6(b), shall bar that party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in Alexandria, Louisiana, on this 16th day of December 2019.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE